UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 3:11–cv–00970 |
| | ) | Judge Aleta A. Trauger |
| SRS, INC., JOSEPH L. SHAW, AUDREY A. SHAW, TALMADGE D. SCOTT, KAYE J. SCOTT, and BOBBY REED, | ) ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM CONCERNING GREAT AMERICAN INSURANCE CO.'S MOTION FOR PRELIMINARY INJUNCTION

Pending before the court is Great American Insurance Co.'s ("Great American") Motion for Preliminary Injunction (Docket No. 15), which the defendants ("the Indemnitors") have opposed (Docket No. 18), and in support of which Great American has filed a reply (Docket No. 25.)[1] The court held oral argument and an evidentiary hearing on December 21, 2011. For the reasons set forth herein, the court will issue a preliminary injunction compelling the Indemnitors to deposit collateral security with Great American in the amount of $1,000,000.00.

---

[1] In support of the motion, Great American filed a supporting memorandum (Docket No. 17) and the supporting Affidavit of Jeffrey Woodard (Docket No. 17). In support of their response, the Indemnitors filed a supporting memorandum (Docket No. 20) and the supporting affidavit of Talmadge Dewayne Scott (Docket No. 19). These submissions attached various exhibits, including letters and emails, the authenticity of which has not been challenged. Furthermore, at the evidentiary hearing, the parties introduced additional exhibits into the record and elicited testimony from Great American's witness, Jeffrey Woodard, a Senior Bond Claims Attorney for Great American. Unless otherwise noted, the facts have been drawn from these documents and testimony. Exhibits introduced into evidence at the evidentiary hearing are referred to herein as "Pltf. Ex. [X]" or "Def. Ex. [X]," as appropriate.

1

## BACKGROUND

I. **Contractual Terms and Bonds at Issue**

SRS, Inc. ("SRS") is a general contractor. Great American has posted bonds on SRS's behalf in connection with construction projects for which SRS has served as the general contractor. To secure Great American's willingness to post these bonds, SRS and the individual defendants named here (the Indemnitors) entered into an indemnity agreement ("Indemnity Agreement") with Great American on May 7, 2007. (Docket No. 16, Ex. 1) In relevant part, the Indemnitors agreed to indemnify and hold harmless Great American "from and against any and all liability for losses, costs, and/or expenses of whatsoever kind or nature . . . and from and against any and all such losses and/or expenses which [Great American] may sustain and incur" in the event that, *inter alia*, Great American faces liability against a bond it issued on behalf of SRS. (*Id.* ¶ 2.)

In relevant part, the Indemnification Agreement provides as follows:

- "Payment by reason of the aforesaid causes shall be made to [Great American] by the [Indemnitors], upon demand by [Great American], as soon as liability exists or is asserted against [Great American], whether or not [Great American] shall have made payment therefor."

- "The amount of such payment to [Great American] by the Indemnitors shall be determined by [Great American]."

- "The [Indemnitors] acknowledge that the failure of the [Indemnitors] to deposit with [Great American], immediately upon demand, the sum demanded by [Great American] as payment *shall cause irreparable harm to [Great American] for which [Great American] has no adequate remedy at law*."

- "The [Indemnitors] agree that [Great American] shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to Great American the sum demanded and *hereby waive any claims or*

2

>   *defenses to the contrary.*"

- "The [Indemnitors] shall be entitled to the refund of any unused portion of the payment upon termination of the liability of this Agreement."

(*Id.*) (emphases added).

The United States Department of Navy ("Navy") hired SRS to perform a lobby renovation project at its facility in Millington, Tennessee ("Lobby Project") and to perform separate work on a balcony at the same facility ("Balcony Project"). The contract price for the Lobby Project was $1.88 million. In connection with SRS receiving the Lobby Project, Great American posted a performance bond and a payment bond ("Lobby Bonds"), each in the amount of $1.88 million. Similarly, in connection with SRS receiving the Balcony Project, Great American posted a performance and a payment bond ("Balcony Bonds"). SRS ultimately was terminated from the Lobby Project, at which point, pursuant to the Indemnity Agreement and the Lobby Bonds, Great American assumed responsibility to complete the project and pay SRS's subcontractors and suppliers. SRS also owes approximately $100,000 to its subcontractors and suppliers on the Balcony Project, for which SRS is also potentially liable under the Balcony Bonds.

In this lawsuit, Great American seeks a preliminary injunction compelling SRS to deposit $1,000,000.00 in cash with Great American as collateral security against Great American's potential liability on these projects, including $900,000 related to the Lobby Project and $100,000 related to the Balcony Project. SRS does not dispute that Great American is potentially liable for $100,000 on the Balcony Project,[2] but it maintains that Great American's

---

[2] Great American's motion also sought an order compelling the Indemnitors to establish a trust account into which the proceeds from the Balcony Project would be deposited for (1)

3

demand for $900,000 on the Lobby Project is excessive and unreasonable.[3]

## II. Lobby Project and Associated Collateral Security Demand

SRS was supposed to complete the Lobby Project by June 2010 but fell behind schedule and, by summer 2011, lacked sufficient cash flow to complete the project. SRS also installed an elevator that did not conform to the specifications of the project. In June 2011, the Navy informed SRS that SRS had failed to complete the Lobby Project within the time required, asserted that SRS had thereby breached the contract, and demanded an updated schedule demonstrating that SRS had sufficient funds to complete the project. (Def. Ex. 1.)

SRS sought to negotiate a compromise with the Navy that would allow it to complete the Lobby Project. On June 28, 2011, it wrote to the Navy and acknowledged that it would cost SRS $904,000 to complete the project, less $364,000 that the Navy still owed (but had not yet disbursed) under the original contract price. (Def. Ex. 2.) SRS promised to absorb the $540,000 balance, which it would seek to cover by applying $75,000 per month in proceeds from other contracts for approximately the next nine months. SRS also listed a charge order request for $716,000, reflecting costs that SRS attributed to the Navy's requests for changes to the original design specifications. Subject to these terms, SRS represented that it could complete the project by April 2, 2012.

By July 11, 2011, SRS notified Great American that it was engaged in a dispute with the

---

payment to SRS's subcontractors and suppliers relative to that project; and (2) reimbursement of Great American relative to its liabilities, losses, or expenses on the Balcony Bonds. (Docket No. 16 at pp. 1-2.) In their response, the Indemnitors agreed to this demand. (Docket No. 20 at p. 6.)

[3]Great American originally demanded $1.2 million in collateral security related to the Lobby Project, but, for reasons described in more detail below, subsequently reduced that portion of its demand to $900,000 at the December 21, 2011 hearing.

4

Navy concerning further work on the Lobby Project.

The Navy was not satisfied with Great American's proposal. In a July 14, 2011 letter to SRS, the Navy noted that the new target completion date was twenty-two months beyond the original completion date. (Def. Ex. 3.) The Navy acknowledged that it (the Navy) had caused delays of six months due to a flooding event and certain design submittal issues but faulted SRS for the rest of the delay. The Navy reiterated that it considered SRS to have breached the contract and demanded that SRS provide a proposal under which the project would be completed in 60 days.

On or about July 19, 2011, Woodard (Great American's Senior Bond Claims Attorney) and another Great American representative were granted access to SRS's books and records, which they reviewed for approximately three days.

On July 21, 2011, SRS responded to the Navy's most recent offer, asking that the Navy waive its right to liquidated damages (which were accruing at $800 per day) make available funds remaining on the contract, and permit SRS to complete the project within 120 days. (*See* Def. Ex. 4.)

On August 3, 2011, apparently following a conference call between SRS and the Navy that same day, SRS made another counter-offer to the Navy. (*See* Def. Ex. 5.) SRS stated, in relevant part, that it could complete the project within 120 days and that "SRS will depend upon [Great American] to fund the project (the approval and notification could take 2-3 weeks to obtain)." SRS conditioned this offer on the Navy's complete waiver of liquidated damages and the Navy's complete acceptance of the non-conforming elevator without replacement.

Woodard testified that, notwithstanding SRS's statement in the August 3, 2011 letter to

5

the Navy, Great American had not in fact promised to provide financing to SRS. Woodard asked Scott to reduce to writing any request for financing from Great American. Accordingly, Scott wrote a letter to Woodard the next day, August 4, 2011, formally requesting additional financing for the project. (Pltf. Ex. 9) ("Please accept this letter as SRS' request to Great American Insurance Company for their support in completing the Lobby Addition project . . . . Specifically, we are asking for your financial support in providing some type of loan financing arrangement . . . .") Woodard wrote back to Scott on August 5, 2011 (the next day), stating that Great American would need to conduct an investigation of SRS before responding to the financing request. (Pltf. Ex. 8.) The letter outlined several preconditions for this investigation to occur and advised Scott that a final decision on whether to provide financial assistance would ultimately be subject to approval from Great American's home office. The letter contained a signature block for Scott to accept these terms, which Scott did not counter-sign until September 9, 2011 – three days after the Navy had terminated SRS from the Lobby Project.

SRS and the Navy continued to negotiate.[4] In response to an August 17, 2011 offer from SRS, the Navy, on August 29, 2011, submitted a counter-offer representing "the Government['s] last attempt to negotiate with SRS to resolve all issues that are preventing SRS from completing [the Lobby Project]." (Def. Ex. 6.) The Navy stated that it would permit SRS to complete the project within 110 days, subject to certain conditions, including partial renovations to the elevator and a temporary – but not absolute – waiver of liquidated damages.[5] The Navy refused

---

[4]It appears that at least some of the correspondence concerning these negotiations is not contained within the record.

[5]According to Woodard, who participated in negotiations between SRS and the Navy, senior Navy officials did not want to waive Navy's right to receive liquidated damages

to grant SRS a performance rating until the job was completed.

On August 31, 2011, SRS responded with another counter-offer. (Def. Ex. 7.) SRS appears to have accepted many of the Navy's conditions, but requested, *inter alia*, that it receive a marginal performance rating upon completion.

Apparently tiring of further negotiations, the Navy rejected this SRS proposal and, on September 6, 2011, informed SRS (copying Great American) of its "final decision" to terminate the contract with SRS for breach. (Def. Ex. 8.) The parties agree that, as of this date, the Lobby Project was approximately 75% complete.

Following termination of the contract, Great American assumed control of the project as the surety on the Lobby Bonds. Under the Indemnity Agreement, Great American had the option of utilizing a contractor of its choice to complete the Lobby Project. SRS desired to finish the project and engaged in discussions with Great American in that regard. In connection with these negotiations, SRS and the Indemnitors provided Great American with access to their financial records, including personal financial statements of the individual Indemnitors. (*See, e.g.*, Pltf. Exs. 4-5.)

During the course of its discussions with SRS, Great American indicated that it would be willing to consider utilizing SRS to complete the project if SRS provided certain collateral security to Great American, including sufficient equity interests in real property. On September 29, 2011, Great American informed SRS that it would consider SRS's request to complete the Lobby Project only if the Indemnitors furnished their interests in 12 specific real properties as collateral security, including first mortgages on unencumbered properties and second mortgages

---

completely.

7

on encumbered properties (Defs. Ex. 9.) The most valuable property on this list was SRS's home office building. In communicating this offer, Great American expressed concern that, if it chose to utilize SRS to complete the project, it would need to loan funds to SRS to pay earned and unpaid balances owed to subcontractors and suppliers and to cover any shortfalls going forward. Furthermore, it expressed concern that SRS might not be able to meet its payroll and general conditions expenses, for which SRS might require further financing from Great American. Finally, it expressed concern that SRS's bank, First Tennessee Bank, might act on SRS's loan default, thereby preventing SRS from completing the project.

On October 5, 2011, SRS submitted a counter-offer. (Def. Ex. 10.) SRS asserted that it "wanted to remain an operating and viable company in order to complete the project and start making payments to Great American." SRS offered the following terms:

- A second mortgage and deed of trust, with the consent of the first security interest holder (First Tennessee Bank) to Great American on eight properties, for which Great American's equity interest allegedly would be at most $512,000.00.[6]

- believed (without any appraisal) to be worth approximately $512,000.

- Periodic payment by SRS to Great American of $5,000 per month, which SRS would be willing to increase once Great American made actual

---

[6]The October 5, 2011 letter does not provide any valuation of the referenced properties, nor are any valuation documents contained in the record. However, in connection with its response, the Indemnitors have stated that their offer of collateral included "[a] second mortgage deed of trust, with the consent of the first security interest holder (First Tennessee Bank), in eight (8) properties, with equity, upon information and belief, estimated in the amount of $512,000.00." (Docket No. 19, Affidavit of Talmadge Dewayne Scott, at ¶ 26(a); Docket No. 20, Response, at p. 4.) As worded by the Indemnitors, it is not clear to the court whether this $512,000 figure represents equity in the property before or after satisfying the bank's priority interest. Of course, if its represents the equity value in the property only after satisfying the bank's interest, the actual collateral security value to Great American would be lower than $512,000.

8

>   payments.

- Substantial savings from allowing SRS to complete the project, rather than another contractor.

- Documentation and cooperation in support of SRS's alleged claims against the Navy.

SRS acknowledged that the list of properties did not include three of the properties sought as collateral by Great American, including the office building.

Great American did not accept this offer, stating that SRS's response to Great American's demands was "unsatisfactory." (Docket No. 16, Ex. 5.) Therefore, Great American demanded $1.3 million from the Indemnitors, collectively, to (1) repay Great American for its losses, costs, and expenses to date; and (2) exonerate Great American from all losses, costs, and expenses and to protect Great American against all liability for losses, costs, and/or expenses going forward. The letter did not articulate the basis for Great American's calculation of the $1.3 million demand. Great American sent this letter to each of the Indemnitors, all of whom were jointly and severally liable under the Indemnification Agreement.[7]

### III. Great American's Estimate of Potential Liability on the Lobby Project

After assuming responsibility for the Lobby Project, Great American solicited bids for completing the project through a competitive bidding process. On December 1, 2011, Great American received a bid proposal from Sherrick Construction, Inc. ("Sherrick"), to complete the Lobby Project for $898,000. (Pltf. Ex. 9.) This was the lowest bid by approximately $100,000

---

[7]At several points in their opposition brief, the Indemnitors take the position that Great American demanded $7.8 million from them – rather than $1.3 million – because Great American sent letters to each of the Indemnitors asserting the $1.3 million demand. This position is without foundation. Great American simply sent demands to each Indemnitor because they are jointly and severally liable for the collateralization obligation.

9

and, therefore, Great American intends to utilize Sherrick to complete the project. Great American has also continued to negotiate with the Navy concerning completion of the Lobby Project. According to Great American, the Navy has conditionally agreed to reduce its liquidated damages demand from $360,000 to $100,000. In the course of its negotiations with the Navy, Great American requested that SRS provide documentation that substantiated SRS's contention that it (SRS) has claims against the Navy, including an equitable claim for $716,000 in change order requests. SRS did not furnish Great American with the requested documentation. Therefore, in reaching its own agreement with the Navy, Great American did not assert SRS's alleged $716,000 equitable claim. However, Great American reserved all of SRS's rights to pursue claims against the Navy, while the Navy reserved its defenses thereto.

On December 5, 2011, SRS filed an administrative appeal of the Navy's decision to terminate SRS from the Lobby Project. (Pltf. Ex. 11.)

Great American has introduced into evidence a now-superseded initial calculation of its potential Lobby Project liability (estimated at $1.2 million) (Docket No. 25, Ex. 1) and a new, revised calculation of its potential Lobby Project liability (estimated at $900,000) that reflects more recent developments (Pltf. Ex. 2.) Great American originally calculated its liability based on the assumption that the Navy would seek full liquidated damages of $360,000 and that it would cost approximately $932,000 to hire a new contractor to complete the project. However, because the Navy later reduced its demand for liquidated damages to $100,000 and Great American received a viable bid for $898,000 to complete the project, Great American has revised its liability calculations downward by approximately $300,000.

Accordingly, the revised liability estimate is calculated based on the following

considerations:

- The Navy owes a contract balance of approximately $500,000, reflecting the contract price ($1.8 million) less what the Navy had actually paid to SRS as of termination ($1.3 million).

- The Navy will retain $100,000 in liquidated damages against that $500,000 balance, meaning that the Navy will pay out a net of approximately $400,000 relative to the original contract balance.

- The new contractor will complete the work for $898,000, an amount that Great American must pay.

- Great American must pay SRS's subcontractors and suppliers approximately $400,000 for earned but unpaid work and/or supplies.[8]

Thus, Great American estimates that it will cost $1.3 million to hire the new general contractor and satisfy SRS's outstanding payables, offset by the $400,000 contribution from the Navy, resulting in total liability of $900,000. Great American's estimate does not include any assessment for attorney's fees, consultant fees, or latent defect claims.

## ANALYSIS

### I. Legal Standard

Under Fed. R. Civ. P. 65 (2011), the court may issue a preliminary injunction compelling the Indemnitors to perform their contractual duty to collateralize Great American. In assessing whether an injunction is appropriate, the court applies the following standard:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an

---

[8]According to Woodard, Great American based this payables estimate on a thorough review of SRS's records in consultation with an expert in this area. Although SRS's counsel questioned whether Great American had provided the court with sufficient documentation concerning its payables estimate, the record contains no testimony rebutting Woodard's testimony concerning the amount owed to these subcontractors and suppliers.

11

injunction is in the public interest.

*Langley v. Prudential Mortg. Co.*, 554 F.3d 647, 648 (6th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).

II.     **Application**

As an initial matter, SRS asserts that the injunction should denied without conducting the *Langley* analysis because granting Great American the relief it seeks would finally dispose of the case. The only legal support cited for this position is an inapposite Sixth Circuit case, *Dunn v. Retail Clerks Intern. Ass'n AFL-CIO, Local 1529*, 299 F.2d 873, 874 (6th Cir. 1962), in which the court declined to issue an injunction pending appeal after the district court had denied the application for a mandatory injunction and dismissed the case. That posture does not apply here. Indeed, a preliminary injunction often effectively resolves the essence of a case and Great American has cited to a number of cases in which courts granted preliminary injunctions under analogous circumstances. *See, e.g., First Nat'l Ins. Co. of Am. v. Sappah Bros., Inc.*, 771 F. Supp. 2d 569, 576 (E.D.N.C. Feb. 18, 2011) (granting surety's requested preliminary injunction that defendant indemnitors immediately post $1.3 million in collateral security).[9] Accordingly, the court will conduct the four-factor analysis.

(A)     Likelihood of Success on the Merits

Great American has demonstrated that it is likely to succeed on the merits. The parties, who are diverse, agree that Tennessee substantive law governs the Indemnification Agreement.

---

[9]Regardless, Great American points out that granting its instant collateral security demand will not dispose of Great American's claims, because Great American may require additional collateral security from SRS on the Lobby Bonds in the future, for which Great American would require subsequent relief.

12

Under Tennessee law, indemnity agreements are enforced according to their plain and unambiguous terms. *Hardeman v. Cnty. Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995); *accord U.S. Fid. & Guar. Co. v. Weed*, No. 3:07-1150, 2009 WL 77262, at \*3-\*4 (M.D. Tenn. June 8, 2009). As with any other contract, "the clear language must be interpreted and enforced as written even though it contains terms which may be considered harsh and unjust by a court." *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 511 (Tenn. 2001) (emphasis). At the same time, an indemnity agreement is subject to the traditional implied obligations of good faith and fair dealing, including the requirement that, "in performance of its duty to indemnify the insured, the insurer is bound to exercise 'good faith' and to act fairly in the interest of the insured." *Old Republic Sur. Co. v. Eshaghpour*, M1999-01918-COA-RCV, 2011 WL 1523364, at \*2 (Tenn. Ct. App. Nov. 30, 2001) (citing *Feld Truck Leasing v. ABC Transnational Transp.*, 681 S.W.2d 554, 556 (Tenn. Ct. App. 1984)).

As described above, the contract obligates the Indemnitors to indemnify and hold harmless Great American against actual and potential liability. It also specifically provides that Great American is entitled to specific performance and that the Indemnitors waived any claims or defenses to the contrary. Furthermore, it states that Great American lacks an adequate remedy at law relative to the Indemnitors' failure to deposit collateral security. The court must enforce these provisions.

Moreover, even without respect to the express terms of the Indemnity Agreement, specific performance of the collateral security obligation is appropriate. *See, e.g. Safeco Ins. of Am. v. Criterion Inv. Corp.*, 732 F. Supp. 834, 843 (E.D. Tenn. 1989) (applying Tennessee law and holding that "[s]ureties are ordinarily entitled to specific performance of . . . collateral

13

security clauses. The Court finds that the [surety] is entitled to recover the amount of this bond to hold as collateral against its ultimate liability to be adjudged in the litigation . . . ."); *see also Sappah*, 771 F. Supp. 2d at 754 (noting that courts "routinely recognize that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages")

In response, the Indemnitors contend that Great American has acted in bad faith by (1) demanding collateral security in the form of cash; (2) seeking relief that allegedly will bankrupt SRS and, perhaps, one or more individual Indemnitors; and (3) asserting an excessive, unsubstantiated, and vague estimate of its potential exposure that exceeded SRS's reasonable offer. None of these arguments is persuasive.

First, the Indemnity Agreement specifically provides that the Indemnitors must, upon demand by Great American following their breach, make "payment" or provide "collateral" to Great American, at Great American's discretion. The Indemnitors articulate no legal or factual support for their position that Great American is not entitled to collateral security in the form of cash, as Great American is demanding.

Second, the Indemnitors have cited to no legal authority that financial hardship provides a defense to a surety's claim and, in any case, the Indemnitors contractually waived their defenses to specific performance by Great American.

Third, each element of Great American's liability estimate is reasonable and substantiated: the $898,000 Sherrick bid, which Great American has introduced into evidence, is is even less than the $904,000 offer that SRS made to the Navy for the same work; SRS does not dispute that the Navy is contractually entitled to liquidated damages; and Great American prepared its estimate of subcontractor and supplier payables based on SRS's records. Finally,

14

SRS does not dispute that Great American is entitled to collateral security of $100,000 on the Balcony Project. Thus, the $1,000,000 demand ($900,000 for the Lobby Project and $100,000 for the Balcony Project) is reasonable.

Moreover, there is not even a modicum of bad faith by Great American here.[10] The evidence indicates the Great American attempted to provide SRS the opportunity to complete the Lobby Project under certain conditions, but agreement could not be reached because SRS refused to include certain valuable properties in the deal. Then, after taking over the project, Great American conducted a competitive bidding process and selected the lowest bidder to complete the project, at a price that was actually $6,000 less than what SRS had offered to the Navy. Great American has also convinced the Navy to reduce its liquidated damages demand by $260,000, an amount by which Great American has (appropriately) reduced its collateral demand here. With respect to the $716,000 equitable claim asserted by SRS against the Navy, Great American asked SRS for documentation substantiating that alleged claim but did not receive it. Therefore, it is understandable that Great American did not press this claim in its negotiations with the Navy. Moreover, in its deal with the Navy, Great American has expressly reserved

---

[10]Great American has also identified a number of district court decisions in which courts have found that an asserted defense of lack of good faith by the principal does not defeat the surety's right to a preliminary injunction for specific performance of the collateralization obligation, in any case. *See, e.g., Sappah*, 771 F. Supp. 2d at 574 ("While the issue of whether [the surety] acted in good faith may be relevant to whether [the indemnitors] ultimately are liable [to the surety] for indemnification under their agreement, it is irrelevant to whether [the indemnitors] are required to post collateral security preliminarily"); *Int'l Fid. Ins. Co. v. Vimas Painting Co.*, 2009 485494 (S.D. Ohio Feb. 26, 2009) ("There is nothing in the language of the indemnity agreement to indicate that the parties intended to condition [the indemnitors'] payment of the $500,000 on a finding that the [surety] acted in good faith in demanding the collateral security"); *Far W. Ins. Co. v. J. Metro. Excavating, Inc.*, 2008 WL 859182, at *11-12 (N.D. Ind. Mar. 28, 2008) (requiring collateral to be deposited, notwithstanding assertion that surety had failed to act in good faith).

15

SRS's right to pursue this claim, which SRS has initiated through the administrative appeals process. Thus, at all times, it appears that Great American has acted in good faith.

Accordingly, Great American is likely to succeed on the merits.

(B)     Irreparable Harm

Great American has shown that it will suffer irreparable harm if the demanded collateral security is not posted. The Indemnity Agreement specifically states that "the [Indemnitors] acknowledge that the failure of the [Indemnitors] to deposit with [Great American], immediately upon demand, the sum demanded by [Great American] as payment *shall cause irreparable harm to [Great American]* . . . ." (emphasis added). The court must enforce this provision as written.

Regardless, courts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been asserted against them. *See, e.g.*, *Am. Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 302 (2d Cir. 1989) ("Having bargained for collateral security and having failed to receive it, [a surety's] injury is real and immediate."); *Int'l Fid. Ins. Co. v. Anchor Envt'l, Inc.*, Civil Action No. 07-04750, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008) ("To protect [the surety] from becoming a general creditor, the grant of specific performance to enforce the collateral security provision is warranted. [The indemnitor] argues that [the surety] will not be irreparably harmed, and that this court should delay an obvious ruling, because [the surety's] assets are great. This argument carries no weight."); *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 923 (E.D.N.Y. 1999) (same). Great American persuasively argues that it is similarly entitled to the benefit of its bargain here, which entitles it to (1) insurance that it is fully collateralized before it sustains additional losses; (2) protection from any loss that might result

16

from the Indemnitors' insolvency and/or dissipation of assets;[11] (3) motivation that the Indemnitors will promptly resolve outstanding claims; and (4) creation of a fund from which Great American may resolve liability that has been or may be asserted against it relative to the Lobby Project bonds and the Balcony Project bonds.

The Indemnitors' only counter-argument is that Great American's harm is "self-inflicted" because Great American refused to accept SRS's tender of collateral security in the form of eight second interests in encumbered property with an alleged collective equity value to Great American of $512,000 or less. (*See supra*, FN 6.) Great American was under no obligation to accept these terms in lieu of demanding specific performance under the Indemnity Agreement. Regardless, where Great American faced liability of approximately $1.3 million (before the Navy reduced its liquidated damages demand), it was not unreasonable to reject SRS's offer of non-priority equity interests in eight un-appraised properties, which, even assuming the quoted figure of $512,000 represents equity after satisfying the bank's interests, were collectively valued at less than half of Great American's potential exposure. Moreover, SRS refused to include in the deal any interest in its office building, which apparently represented the greatest equity interest potentially available to Great American. At any rate, Great American now faces liability exposure of $100,000 on the Balcony Project and of $900,000 on the Lobby Project, for which it has already hired a general contractor and begun satisfying SRS's outstanding payables to sub-contractors and suppliers.

Accordingly, the court finds that Great American will suffer irreparable harm if it is not

---

[11]Indeed, its appears that the net worth of one individual Indemnitor dropped by over $2 million between May 2011 and September 2011. (Pltf. Exs. 4-5.)

provided the demanded collateral security.

(C)     <u>Balance of the Equities</u>

The Indemnitors complain that enforcement of Great American's rights will cause financial hardship to SRS and, perhaps, to certain individual Indemnitors. However, they cite to no legal authority that financial hardship is a defense or that it should tip the equities in SRS's favor. Indeed, Great American is simply seeking to enforce its right to collateral security under the Indemnity Agreement, which courts have routinely found satisfies the equities balancing test, even where enforcement causes financial hardship to the principal. *See, e.g., Int'l Fid. Ins. Co.*, 2008 WL 1931004, at *7 (finding that equities favored surety because "[t]he issuance of an injunction will only require the [indemnitors] to do that to which they agreed – to place [the surety] in funds – and will only permit [the surety] to retain the funds until the right of [the surety], [t]he indemnitors, and [the obligee] can be determined. [The indemnitors] are not unfairly prejudiced by being held to the Agreement of Indemnity to which they were signatories"); *Travelers Cas. & Sur. Co. v. Ockerlund*, No. 04 C 3963, 2004 WL 1794915, at *5 (N.D. Ill. Aug 6, 2004) (finding that equities favors surety because the indemnitors "will be required to perform as they contractually agreed to do," thereby avoiding "serious harm" to the surety, which would otherwise need to use its own funds to resolve asserted claims); *Great Am. Ins. Co. v. Conart*, No. 1:05-CV-038 (WLS), 2006 WL 839197, at *9 (M.D. Ga. Mar. 29, 2006) (equities favor the surety, even though it would cause financial hardship to the principal).[12]

SRS already received its benefit of the bargain by receiving, at low cost and without

---

[12] Even if financial hardship to SRS were a relevant consideration, the Indemnitors have not provided testimony or documentation establishing that enforcing the Indemnity Agreement will in fact bankrupt them.

18

furnishing collateral, multi-million dollar bonds from Great American that enabled SRS to receive contracts such as the Lobby Project and Balcony Project. It is unfortunate that SRS ultimately was terminated from the Lobby Project by the Navy and was unable to reach an agreement with Great American to complete the job. However, Great American is plainly entitled to its end of the bargain – *i.e.*, enforcement of SRS's promise to secure Great American against any losses asserted because of SRS's underlying failure to perform on a bonded contract. Therefore, the court finds that the balance of the equities favors Great American.

    (D)    <u>Public Interest</u>

"Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains." *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009) (stating that "the law favors enforcing contracts as written"). Furthermore, Great American persuasively argues that enforcing surety agreements serves an important public interest by ensuring the solvency of surety companies and supporting the ability of surety companies to provide necessary bonding for public works projects. *See Int'l Fid. Ins. Co.*, 2008 WL 1931004, at *7 (finding that issuing preliminary injunction in favor of surety vindicated public interests); *Developers Sur. & Indem. Co. v. Elec. Serv. & Repair, Inc.*, No. 09-21678-CIV, 2009 WL 3831437, at *2 (S.D. Fla. Nov. 16, 2009) (same). Therefore, an injunction here serves the public interest.

## CONCLUSION

The motion for preliminary injunction will be **GRANTED**. The court will order the Indemnitors to deposit $1,000,000.00 in cash with Great American as collateral security by January 6, 2012. This relief will be conditioned upon Great American posting a bond with the

19

Case 3:11-cv-00970   Document 26   Filed 12/23/11   Page 19 of 20 PageID #: 495

Clerk in the amount of $10,000.

    An appropriate order will enter.

                                                                         _____
                                                                         ALETA A. TRAUGER
                                                                         United States District Judge